JUDGE BERMAN

10 CV 4774

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

ANGEL CASTRO,                                              Civil Action No.:

                              Plaintiff,

        -against-                               **COMPLAINT AND
                                                 JURY DEMAND**

PLS CHECK CASHERS OF NEW YORK, INC.,
PLS CHECK CASHERS OF ILLINOIS, INC.,
and ZABDI ROSERO,

                              Defendants.

------------------------------------------------------------------x



## PRELIMINARY STATEMENT

1.      Plaintiff brings this action for discrimination, harassment and retaliation with respect to

terms and conditions of employment pursuant to 42 U.S.C. § 1981 ("Section 1981"); the New

York State Human Rights Law, Executive Law §290, *et seq.* ("SHLR") and the New York City

Human Rights Law, §8-107 *et seq.* of the Administrative Code ("CHRL").

## JURISDICTION

2.      Jurisdiction is conferred upon the Court by 28 U.S.C. §§ 1331, 1343 and 1367.

3.      Venue lies in the Southern District of New York in that the unlawful actions complained

of and the records relevant to such practices are maintained and administered within the State of

New York and within this district.

4.      All conditions precedent to the institution of this suit have been satisfied.

## PARTIES

5.      Plaintiff Angel Castro ("Plaintiff" or "Mr. Castro") is of Puerto Rican descent, a citizen

of the United States and resides in the State of New York.

6.     Defendant PLS CHECK CASHERS OF ILLINOIS, INC. is the parent company of Defendant PLS CHECK CASHERS OF NEW YORK, INC. (collectively "PLS") with the same management and ownership structure.

7.     Defendant PLS CHECK CASHERS OF NEW YORK, INC. is a corporation registered and doing business in the State of New York with various offices located within New York City and a principal office at 40-35 Junction Boulevard, Corona, N.Y. 11368 (the "Corona office").

8.     Defendant ZABDI ROSERO ("Defendant Rosero") is PLS's Director of Operations for the New York area and is based in the Corona office.

9.     Defendant Rosero is a Hispanic male from Colombia and was, at all relevant times, Plaintiff's direct supervisor.

10.    Defendant Rosero personally committed and/or directed the discriminatory and retaliatory acts alleged herein against Plaintiff and personally made the decision to unlawfully terminate Plaintiff's employment.

11.    All Defendants are employers within the meaning of the laws being sued hereunder.

## STATEMENT OF FACTS

12.    PLS hired Plaintiff on February 14th 2007 as a District Manager.

13.    At this time, Plaintiff already had over 16 years of experience in the check cashing industry.

14.    As a District Manager, Plaintiff was responsible for overseeing the store managers and assistant store managers in managing the PLS stores assigned to him.

15.    Plaintiff was initially assigned the following stores: 2040 Amsterdam Avenue in Manhattan (the "Amsterdam Avenue store"), the 729 4th Avenue store in Brooklyn (the "4th

Avenue store") and the 954 Jewett Avenue store in Staten Island (the "Staten Island store").

16.     In August 2007, Plaintiff was given responsibility for opening another store located at 84 West Fordham Road, Bronx, NY 10468 (the "Bronx store.")

17.     The store operations that Plaintiff was ultimately responsible for overseeing included budgets, profit and loss, customer service and the hiring, training and supervision of employees.

18.     Defendant Rosero directly supervised Plaintiff throughout his tenure at PLS.

19.     Plaintiff's work performance throughout his employment was excellent as reflected in his annual performance appraisals.

20.     After Mr. Castro assumed managerial oversight of a store, the profit and loss performance at that store would show a marked improvement and those stores were soon consistently rated among the top ten of PLS's most profitable stores in the United States.

### PLS's Discriminatory Employment Practices Favoring Hispanic Employees

21.     As part of Plaintiff's training, he visited all of PLS's stores in the New York metropolitan area and was introduced to the managers and customer service representatives ("CSR"), who handle the cash transactions with the customers.

22.     Mr. Castro immediately noticed that PLS's stores in New York City were almost all exclusively staffed by Hispanic managers and employees.

23.     Of PLS's ten stores in the New York area, at least nine out of ten are managed by Hispanic managers and assistant managers and almost all of the employees in these stores are Hispanic.

24.     Thus, of the approximate 125 individuals employed by Defendants within New York City, at least 120 are Hispanic.

25.     The stores are exclusively staffed by Hispanics despite being located in areas with a high

percentage of African-Americans and relatively low concentration of Hispanics, such as the 4th Avenue store.

26.    The Amsterdam Avenue store does not employ one single African-American employee and the managers and assistant managers of the Amsterdam Avenue have all been Hispanic within the past 5 years.

27.    Annie, the current store manager in the Amsterdam Avenue store, speaks very little English despite the fact that many of the store's customers are African-American.

28.    Plaintiff noticed that non-Hispanics with the right credentials were not even given interviews for position with PLS.

29.    PLS received few applications from people of ethnicities other than African-American and Hispanic, so most of those denied employment opportunities in favor of Hispanics were African-American.

30.    Despite the obvious discrimination in favor of Hispanics, Mr. Castro was not deterred and hired people based on merit and qualification without regard to race and ethnicity.

31.    Many of the people whom Plaintiff hired and trained were African-American and because of this, he was met with obstruction and was retaliated against.

32.    Soon into their employment, Plaintiff was either forced to terminate or transfer all African-Americans that he hired during his tenure.

33.    Martha Adames, the Dominican store manager of the 4th Avenue store, tried to prevent Mr. Castro from hiring African-Americans, claiming she needed people fluent in Spanish.

34.    This despite the fact that the 4th Avenue store was already overwhelmingly staffed by fluent Spanish speakers.

35.    Plaintiff even witnessed Ms. Adames tearing up job applications of non-Hispanic

applicants.

36.     When Plaintiff asked Ms. Adames why she was not considering those applications, she claimed that it was because the applicants could not speak Spanish.

37.     Mr. Castro was undeterred and continued to hire well-qualified African-Americans over Ms. Adames' objections.

38.     Once hired, however, Ms. Adames would refuse to train the African-American employees and soon find excuses to terminate their employment.

39.     Ms. Adames would discipline the African-American employees by bypassing Plaintiff and involving Defendant Rosero directly, undermining Plaintiff's authority as Ms. Adames' direct supervisor.

40.     Defendant Rosero would accede to Ms. Adames' demands, over Plaintiff's objections, and thus aid and abet her discrimination against African-Americans.

41.     For example, during the latter part of 2007, Mr. Castro hired a well-qualified young African-American woman to become a supervisor in the 4th Avenue store.

42.     This African-American individual was supposed to be trained in all aspects of supervision yet Mr. Castro noticed that Ms. Adames refused to train her and just assigned her menial duties in a corner of the store.

43.     Within mere days of her hire date, Ms. Adames started to unfairly complain to Plaintiff that this young lady had a bad attitude, that she came into work late and that she could not speak Spanish.

44.     In response, Plaintiff told Ms. Adames to work with the young lady and make sure she was trained adequately.

45.     In fact, the African-American woman was professional and while she was marginally late

on occasion she was more punctual than many of the Hispanic members of staff; yet Ms. Adames singled her out because of her race.

46.      Instead of working with this young lady, Ms. Adames went over Plaintiff's head and demanded that Defendant Rosero terminate her employment.

47.      Defendant Rosero immediately instructed that Plaintiff discharge this young woman over Mr. Castro's objections that Ms. Adames had refused to train her and any individual who was not Hispanic.

48.      By way of another example, in August, 2007, Richard Ferguson, who is African-American, was hired as the store manager of the Bronx store.

49.      Mr. Ferguson was very qualified as he had over 12 years of experience in the check cashing business.

50.      Plaintiff supervised Mr. Ferguson directly for three months and found his work performance to be good throughout.

51.      On September 30th, 2007, Plaintiff was assigned to another store and Lucy Perez, a Dominican District Manager, took over responsibility for the Bronx store.

52.      Within two months of that reassignment, Ms. Perez demoted Mr. Ferguson without basis to the position of assistant manager and replaced him with a young Hispanic woman from Colombia, Paola Colón.

53.      Ms. Colón was far less qualified than Mr. Ferguson, having only about four years of relevant experience.

54.      Ms. Perez then assigned Mr. Ferguson a floating position in the Company, meaning that he could be assigned to any store.

55.      Hispanic managers and employees at PLS enjoyed favorable lenient treatment in many

different ways.

56.     Defendant Rosero would refuse to discharge or discipline Hispanic employees and

managers even when they were caught stealing or taking drugs, whereas African-Americans

would have been discharged immediately for the same offense.

57.     For example, in June 2007, Juliette Espinosa, the then store manager of the Staten Island

Store, admitted to taking $80 cash from the personal funds of one her CSRs, Melinda, to cover a

cash shortage in her draw.

58.     Defendant Rosero and Plaintiff met with Ms. Espinosa who confessed that she had

unlawfully taken the money from Melinda to cover a shortage.

59.     Ms. Espinosa should have been fired immediately for this serious violation of PLS's

company policy, yet Defendant Rosero merely transferred her to another store and demoted her

to an assistant manager position without reducing her salary.

60.     Within months, however, Ms. Espinosa was promoted again to the night Manager

Position.

61.     Ultimately, Ms. Espinosa was discharged for failing to respond to an emergency situation

in a store that had run out of money because she was smoking marijuana on the job with a friend

who had no connection to PLS.

62.     Defendant Rosero only terminated Ms. Espinosa's employment after four managers

lodged formal complaints against her.

63.     Upon information and belief, despite committing numerous violations, Defendant Rosero

rehired Ms. Espinosa in 2008 and she currently manages a store in Staten Island.

64.     Defendant Rosero also refused to fire Ms. Adames despite finding her completely

intoxicated at her 4th Avenue store in December, 2007.

65.    Mr. Castro alerted Defendant Rosero that he had spotted Ms. Adames on the surveillance cameras arriving to work visibly drunk with a supervisor of the store, Annie Baez, after a night out together.

66.    Defendant Rosero reviewed the surveillance himself and witnessed both Ms. Adames and Ms. Baez sleeping in the store.

67.    Ms. Adames was suspended for one week as a result and briefly demoted to an assistant manager position for about a month but then reinstated as a store manager.

68.    Ms. Baez was just suspended.

69.    Defendant Rosero especially favored fellow Colombians in their terms and conditions of employment and he hired and promoted many Colombians who were not qualified for the position and/or lacked the necessary experience.

70.    For example, Rosero promoted his cousin, Stephanie Aguilar, to an assistant store manager position despite lacking the qualifications and experience for the role.

71.    Ms. Aguilar's work performance was severely lacking and she committed numerous errors yet Defendants never reprimanded her.

72.    Instead, Defendant Rosero covered up Stephanie's mistakes with illegal or highly questionable conduct of his own.

73.    For example, in or about March 2008, PLS's collections manager, Max Rodriguez, told Plaintiff that Stephanie's draw had a cash shortage of $1000 and that Defendant Rosero improperly covered this shortfall with funds from a money order that had been sent to PLS's collections department.

74.    In effect, Defendant Rosero had unlawfully converted funds sent by a customer to PLS's collections department for a bad check in order to cover the cash shortfall in his cousin's cash

drawer.

75.     Within a relatively short period of time, Defendant Rosero promoted Ms. Aguilar to manage PLS's Staten Island store.

76.     Similarly, Defendant Rosero refused to discharge another Columbian, Carlos Osorio, despite poor work performance and the fact that it was commonly known that Mr. Osorio would periodically go on crack cocaine binges and be absent from work for several days.

77.     Mr. Osorio managed PLS's store at 230-02 South Conduit Avenue, Springfield Gardens, New York, which was notorious for sloppy and illegal procedures, including cashing obviously fraudulent checks and regularly having large cash shortages.

78.     Mr. Osorio's store was ranked as PLS's worst in New York.

79.     Mr. Osorio's District Manager, Peter Twarik, tried to terminate his employment on many occasions, but was prevented from doing so by Defendant Rosero.

80.     In stark contrast, Defendant Rosero disciplined non-Hispanic employees very harshly for even the simplest of mistakes, or even when they had committed no error.

81.     For example, in or about April 2008, Rosero forced Plaintiff to suspend a Haitian employee, Andre, for one week without pay over a simple misunderstanding concerning a female customer who had attempted to cash a check for about $1000.

82.     Andre had asked the female customer in question to show her ID card before cashing the check.

83.     Because this customer could not produce any identification, Andre refused to cash the $1000 check.

84.     In asking to see her ID, Andre was not breaching company procedures but taking a simple precaution given the large amount of the check and because he did not know this woman

9

personally.

85.    Moreover, the woman was attempting to cash a check at approximately 12:30 AM, was visibly intoxicated and became verbally abusive to Andre.

86.    Plaintiff confirmed that this woman was drunk upon reviewing the surveillance footage of the incident.

87.    Plaintiff complained to Defendant Rosero that Andre did not deserve to be suspended as he had not violated company policy, but to no avail.

88.    Andre wrote a letter of complaint to PLS's head office in Chicago stating that he had done nothing wrong to warrant a one week suspension without pay.

89.    Upon information and belief, PLS did not take any responsive action and Andre resigned from PLS a couple of weeks later after providing eight years of valuable service to the company.

90.    Had Andre been Hispanic, Defendant Rosero would not have suspended him.

91.    Plaintiff voiced his objection to Defendant Rosero of this unfair treatment of Andre, stating that that there was a double standard in the company and that Hispanics were being "let off the hook."

92.    Plaintiff cited as an example the fact that Rosero did not fire Martha Adames and Annie Baez, who were recently found sleeping and intoxicated at work.

93.    As stated below, Plaintiff complained about Defendants' discrimination and other unlawful and unethical activities.

94.    Plaintiff's complaints triggered reprisals and culminated in Plaintiff's unlawful discharge.

### Defendants' Other Unlawful Activities

95.    Defendants committed other unlawful acts throughout Plaintiff's employment, including violating Federal and state banking, financial and insurance regulations.

96.    For example, Defendant Rosero instructed Plaintiff to personally transport cash in amounts ranging from $25,000 to $100,000 between PLS's offices without security personnel and or any type of security whatsoever.

97.    Defendant Rosero would risk Plaintiff's and other managers' personal safety by instructing them to transport large amounts of cash to each location by driving their cars or by taking public transport without a security escort.

98.    This was in direct violation of industry standards and the terms of Defendants' insurance policy requiring qualified security personnel to escort a person physically transferring any amount of cash.

99.    Another violation occurred in July 2007, when PLS New York City stores were seriously short on funds due to Defendant Rosero having miscalculated the money orders for each store.

100.    So, Defendant Rosero sent Plaintiff to a bank in New Jersey to retrieve over $250,000 in cash, which he then had to personally distribute to PLS's New York City stores so that they would have enough funds for the weekend.

101.    Again, Rosero instructed Plaintiff to do this entirely alone and without a security escort.

102.    Plaintiff often complained to Defendant Rosero that transferring money without a security escort violated banking regulations, but to no avail, and Plaintiff continued to carry out Defendant Rosero's orders and make cash deliveries on his own in order to keep his job.

103.    In May of 2007, the manager of the Amsterdam Avenue store, Jenny Peña, told Mr. Castro that while reviewing the store's paperwork for the prior month, she noticed some apparently fraudulent transactions.

104.    Mr. Castro investigated and discovered that numerous US treasury tax refund checks had been cashed in the Amsterdam store by certain individuals using apparently fake IDs, including

ID's featuring the same person but with differing names and/or differing addresses, or out of state ID's with addresses within New York State.

105.   Plaintiff performed an audit and discovered that approximately $300,000 worth of checks were cashed in this fraudulent manner.

106.   Plaintiff relayed his findings and Defendant Rosero indicated that he would take care of it and contact the relevant Federal government entities regarding Mr. Castro's findings.

107.   It was Defendants' responsibility to report the fraudulent check transactions to the US Treasury Department and the Banking Department.

108.   For example, the Bank Secrecy Act requires financial institutions to report suspicious activity that might signify money laundering, tax evasion, or other criminal activities.

109.   Upon information and belief, Defendant Rosero did not contact the US Treasury Department, the New York State Banking Department or any other government agency as no governmental investigator ever contacted Plaintiff or came to the stores to investigate the possible fraud.

110.   Defendant Rosero did contact PLS's Vice President of Check Cashing Operations, Quin Chandler, in Chicago about the fraudulent transactions that Plaintiff had discovered, but no one from PLS ever addressed the situation or spoke with Plaintiff regarding his findings.

111.   Instead, Defendant Rosero instructed Plaintiff to terminate Ms. Peña's employment.

112.   This was unfair as Ms. Peña reported the fraud and, as Plaintiff discovered, most of the fraudulent checks in issue were cashed while Ms. Peña was on a six to eight week medical leave.

113.   Mr. Castro reported this fact to Defendant Rosero but to no avail.

114.   The assistant manager of the Amsterdam Avenue Store, Iris, was also terminated and held partly responsible for not catching the fraudulent checks.

115.   Ms. Peña and Iris had only abided by Defendants' de facto company policy that stores were not to refuse to cash checks, especially tax refund checks.

### PLS's Practice Was To Not To Refuse to Cash a Check

116.   Defendants' de facto policy – at least in its New York City stores – was that CSRs were rarely to refuse to cash a check.

117.   For example, in a flagrant departure from industry standards, Defendant Rosero required his stores to cash government-issued tax refund checks or advance checks from tax preparers such as H&R Block without ID and without the necessary supporting documents such as the customer's tax return forms.

118.   As a result, PLS rarely refused to cash a check even when the circumstances were suspicious or where financial regulations prohibited it.

119.   For example, banking regulations required PLS to refuse to cash a check from an entity that had issued two prior bad checks, yet PLS would always cash the checks from such companies or persons.

120.   Again, for first time customers particularly, prudent banking standards dictated that PLS should have verified with the maker of the checks and with the issuing bank that the funds were available and the check proper before cashing it.

121.   Defendant Rosero constantly stressed the need, however, for his stores to cash checks even for first time customers who did not have ID.

122.   In instances where the check could not be verified with the maker and the issuing bank, PLS would always provide the customer with a cash advance of 10% of the total check value.

123.   PLS would then deposit the check and pay the customer the balance of the funds as soon as the check cleared.

124.   If the check value was under $500, PLS's standard procedure was to loan the customer the entire amount pending verification and PLS would assume the risk of the check not being honored.

125.   Providing customers with these short terms loans is a serious violation of banking and finance regulations.

126.   Plaintiff complained at length to Defendant Rosero that these check cashing procedures were illegal.

127.   Defendant Rosero would simply reply, "Yeah, I know but we're doing it anyway."

128.   Thus it was this de facto policy and Defendants cavalier attitude towards banking regulations and prudent industry safeguards in general that was a leading cause of the $300,000 worth of checks being fraudulently cashed in the Amsterdam store and on other occasions in the past.

129.   Iris applied for unemployment benefits, which Defendants opposed claiming that she had lost her employment for misconduct, i.e., that she did not follow the correct check cashing procedures.

130.   Mr. Castro was forced to attend the hearing before an ALJ at the Department of Labor to determine Iris's entitlement for unemployment and to air Defendants' misconduct claims.

131.   After hearing all parties, the ALJ upheld Iris's right to receive unemployment benefits, holding that Iris had complied with PLS's procedures in authorizing the cashing of the tax refund checks.

132.   Similarly, in May 2008, Defendant Rosero personally authorized the cashing of $225,000 worth of fraudulent checks at PLS's store in Freeport, Long Island ("the Freeport store").

133.   Upon investigation, it appeared that the ten or fifteen checks in question were "kited," a

fraudulent transaction involving the maker and payee of the checks working in concert.

134.    Namely, the payee of the checks cashed the checks at PLS totaling approximately $225,000, while the maker verified the funds were available to PLS only to withdrew the money after the checks were deposited.

135.    Upon information, Defendant Rosero did not press charges against the two persons who had committed the fraud despite personally meeting with the individual who had cashed the fraudulent checks in his Corona office.

136.    In fact, while the individual was in Defendant Rosero's office, Mr. Castro told Defendant Rosero to call the police and have the individual arrested.

137.    Defendant Rosero told Mr. Castro to "stay out of it" and promised that he would "deal" with the situation.

138.    Defendant Rosero unfairly blamed the store manager of the Freeport store, Julisse, for cashing the $225,000 worth of checks and terminated her employment, claiming that he had not authorized those transactions.

139.    In reality, however, Defendant Rosero must have authorized these transactions as only he was empowered to authorize the cashing of checks in excess of $10,000 within New York City; not even the District Managers could authorize such transactions.

140.    PLS's written protocol provided that Store Managers could unilaterally authorize checks of value up to $5000 each, District Managers could authorize the cashing of checks of values up to $10,000 each and only Defendant Rosero could authorize the cashing of checks in excess of $10,000 each up to a total value of $30,000.

141.    Defendant Rosero would receive a request from the store managers or District Managers to authorize any check exceeding $10,000 in value by text or email via his Blackberry, and any

accompanying documentation.

142.   Defendant Rosero would then either approve the transaction or not.

143.   Defendants directed other unlawful activities in violation of the labor laws.

**Defendants Violated the Labor Laws By Making Illegal Wage Deductions from Employees' Paychecks.**

144.   As stated above, Defendant Rosero directed that CSRs could not refuse to cash checks.

145.   If a particular CSR was found responsible, however, for cashing a check that turned out to be fraudulent or a forgery, Defendant Rosero would force the CSR to repay PLS the money lost for that check in the form of deductions from their paychecks.

146.   Rosero enforced this policy strictly and would make unlawful wage deductions from a CSR's wage check until all of the money was paid back.

147.   Most of the CSR's who were victim to these unlawful wage deductions did not know that the wage deductions were unlawful.

148.   During 2008, the Department of Labor investigated PLS's New York stores due to complaints from former employees about these unlawful wage deductions.

149.   Subsequent to the Department of Labor investigation, Defendant Rosero advised Plaintiff that PLS could no longer make deductions from employees' salaries for losses.

150.   Thereafter, Defendant Rosero started forcing the employees to pay back any losses to PLS in the form of weekly cash payments.

151.   During a weekly Tuesdays managers meeting, at which Plaintiff was present, Defendant Rosero instructed the store managers to draw up an excel spreadsheet to tabulate each CSR's daily shortages in their cash registers.

152.   At the end of the week, the store managers were required to collect in cash each CSR's cash register shortages or other losses.

153.    At the end of the week, the shortages paid back would be reported as "overage" to avoid reporting these payments having come from the employees.

154.    After the Department of Labor investigation, Defendants also still continued to force CSRs to pay back losses to the company arising from bad checks in the form of weekly cash payments.

155.    The store manager would hold the cash until the bad check was fully paid off and then issue the collections department a money order for the entire value of the bad check.

156.    Plaintiff was appalled by these unlawful wage deductions from employees who could least afford them and would complain on a constant basis to Defendant Rosero that PLS had no right to make these deductions.

157.    Defendant Rosero would just respond, "If they can't pay, they can't work."

158.    Several CSRs resigned their positions as they could not afford to pay back the shortage or losses.

159.    Plaintiff's regularly voiced his objections about this and PLS's other unlawful activities to Defendant Rosero, which triggered reprisals and ultimately Plaintiff's discharge.

### **Plaintiff's Protected Activity**

160.    As stated above, the discriminatory employment practices weighed heavily on Plaintiff's conscience and Mr. Castro voiced these concerns to Defendant Rosero personally throughout his employment.

161.    Plaintiff complained to Rosero on numerous occasions that PLS was discriminating against African-Americans in favor of Hispanics, that less qualified Hispanics were being hired for positions for which they lacked the skills and expertise and that PLS should be making hiring decisions based solely on a person's qualifications and experience without regard to race.

162.   Plaintiff also told Rosero on numerous occasions that PLS's managers and employees should be held to the same standards without regard to race, citing the examples mentioned above, including Hispanics who were not fired for being drunk on the job or taking drugs.

163.   Plaintiff also aired his concerns to Defendant Rosero about the racial disparity in hiring and promotional opportunities during the managers' meetings held every Tuesday but no one wanted to discuss these issues.

164.   Because Defendant Rosero ignored Plaintiff's complaints, he began to relay his concerns about the racist practices to PLS's executives.

165.   Firstly, in June, 2007, Plaintiff complained to PLS's Director of HR, Emma Thomas, who was in New York City for a brief period, of his concerns about Defendants' racist double standards and the fact that only Hispanics were being hired and retained.

166.   As examples, Mr. Castro cited Ms. Adames' discriminatory practices in the 4th Avenue store that Defendant Rosero was hiring Hispanic managers without the necessary qualifications and experience and that Defendant Rosero had hired Colombians Stephanie Aguilar, Juliette Espinoza, and Carlos Osorio as store managers without the necessary work experience.

167.   Mr. Castro also raised his concerns about the store managers' general lack of productivity and how every store manager took the day off every Wednesday.

168.   Ms. Thomas indicated to Mr. Castro that a person called Luis Gomez was in the process of being trained in Chicago to assume the title of HR Director for the New York area and told Mr. Castro not to "worry about it", implying his concerns about diversity were being addressed.

169.   Ms. Thomas conceded that hiring a more diverse workforce was a pressing issue for the New York City stores and that hiring only Hispanic managers was problematic, especially if these managers spoke mainly Spanish.

170.    Luis Gomez assumed the role of HR Director approximately two weeks after Plaintiff's conversation with Ms. Thomas.

171.    Upon information and belief, Defendant Rosero hired Mr. Gomez for this role.

172.    Plaintiff met with Mr. Gomez in June 2007 and repeated the same concerns he had previously relayed to Ms. Thomas regarding PLS's discriminatory employment practices.

173.    Subsequently, Plaintiff formally complained to Mr. Gomez about PLS's other unlawful and unethical activities, including lack of security escorts when transporting cash and the unlawful wage deductions from employees.

174.    Mr. Gomez indicated to Plaintiff that there would be "changes" but did not go into detail except to state that he would personally be scheduling and conducting all interviews for prospective managers and assistant managers.

175.    Ultimately, nothing changed and PLS did nothing to address the disparity in hiring and the other discriminatory employment practices and managers continued to hire only fellow Hispanics, including family and friends.

176.    It became obvious that Mr. Gomez had little, if any, real authority over Defendant Rosero.

177.    In fact, Mr. Gomez was required to get Defendant Rosero's approval for all personnel actions.

178.    Also, upon information and belief, Mr. Gomez relayed to Defendant Rosero that Plaintiff had complained about him as Defendant Rosero became increasingly hostile towards Plaintiff.

### Defendant Rosero Continues to Retaliate Against Plaintiff

179.    Defendant Rosero retaliated against Plaintiff for his complaints about the discriminatory practices, labor law violations and other illegalities, especially after Plaintiff personally aired

these concerns with Ms. Thomas and Mr. Gomez in June, 2007.

180.   In September 2007, Mr. Rosero transferred Mr. Castro from the Amsterdam Avenue store and assigned him to the Roosevelt Avenue and Northern Boulevard stores to scrutinize him more intensely given that Rosero worked close to those stores.

181.   Also, Rosero started to increasingly require Plaintiff to spend much of his time in small claims court, whereas previously court appearances were shared between all three district managers on a rotational basis.

182.   Moreover, despite Plaintiff's objections to Ms. Thomas and Mr. Gomez, Defendant Rosero continued to require Plaintiff to transfer cash in amounts ranging from $25,000 to $100,000 between PLS's location without security jeopardizing his personal safety.

183.   Defendant Rosero also favored his other two District Managers, Lucy Perez and Peter Twarik, in the terms of their employment.

184.   Unlike Plaintiff, these two other District Managers did not complain about PLS's discriminatory practices.

185.   For example, Rosero assigned the two biggest stores in terms of revenue to Lucy Perez and as a result she was paid a much higher bonus than Plaintiff despite never working a full day and rarely visiting her stores.

186.   Ms. Perez also lacked Plaintiff's work experience.

187.   Defendant Rosero also refused to compensate Plaintiff with an adequate bonus in April or May, 2008, for having managed Ms. Perez's store on Junction Boulevard for two months while Ms. Perez was on maternity leave.

188.   Defendant Rosero promised to pay Mr. Castro a bonus from the sales in the Junction Boulevard store, but failed to do so.

189.   However, Defendant Rosero paid Ms. Perez her full quarterly in May, 2008, despite not having been on maternity leave throughout much of that time.

**Plaintiff's Final Complaint That Causes his Dismissal on June 17, 2008.**

190.   In May 2008, Plaintiff lodged another formal complaint with Luis Gomez that Defendant Rosero had unfairly suspended Andre without pay, stating that had he been Hispanic he would not have been disciplined.

191.   Plaintiff cited Rosero's refusal to discipline Ms. Adames and Ms. Baez as evidence of the favorable treatment enjoyed by Hispanics.

192.   Plaintiff told Mr. Gomez that he was upset that PLS had lost a loyal, hardworking and excellent employee who had never written up or disciplined during his eight years at the company.

193.   Plaintiff told Mr. Gomez that he intended to raise his concerns about the discrimination, including the unfair treatment of Andre, with PLS's Presidents, Bob Wolfberg and Dan Wolfberg, and the VP of Check Cashing Operations, Quin Chandler, who were due to arrive on June 17, 2008 to perform a quarterly review of the New York City stores.

194.   Mr. Gomez did not investigate Plaintiff's complaint.

195.   Instead, Mr. Gomez relayed to Defendant Rosero that Plaintiff had complained about him and was about to complain to Defendants' Presidents as Defendant Rosero retaliated by unfairly suspending Plaintiff for a week with pay before terminating Plaintiff's employment to ensure that Plaintiff was not at work during Bob Wolfberg and Dan Wolfberg's visit.

196.   On Sunday, June 15, 2008, Peter Twarik, a District Manager with PLS, called Mr. Castro at home and asked him to drive to Staten Island to transfer some money to his store.

197.   Plaintiff responded that he was not on duty that weekend and that he should contact

Defendant Rosero.

198.    Upon information and belief, Ms. Perez was the District Manager on call that weekend.

199.    Within five minutes of that conversation, Defendant Rosero called Plaintiff at home and unfairly berated him for not transferring the money, shouting "Why are you not on call?"

200.    Plaintiff replied that he was not on call that weekend and had been on call the last two consecutive weekends.

201.    In fact, Defendant Rosero knew that Plaintiff was not on call that weekend but purposely called Plaintiff on his day off to berate him and to provoke an argument.

202.    Plaintiff complained to Defendant Rosero that he was being held to a different standard than the other District Managers because he had spoken out about the racism in the stores.

203.    Mr. Castro added that on June 17, 2008, he intended to complain to Bob and Dan Wolfberg and Quin Chandler about the harassment that he was suffering and the "discrimination that was going on in the company."

204.    Defendant Rosero did not respond but abruptly hung up the phone.

205.    Plaintiff tried calling Defendant Rosero throughout the day from both his home phone and his company phone.

206.    Defendant Rosero sent an email to Plaintiff later that day falsely accusing Mr. Castro of cursing at him and telling Plaintiff to see him the following day.

207.    On Monday June 16, 2008, 8:30 AM, Mr. Castro called the office to speak to Defendant Rosero, but he was not in the office and he spoke instead with Defendant Rosero's administrative assistant, Jacklyn.

208.    Plaintiff told Jacklyn that he did not feel well, that he was taking the day off and would be returning to work the next day.

209.    In reality, Plaintiff was anxious and stressed due to the retaliation and harassment that he was suffering at the hands of Defendant Rosero.

210.    Jacklyn called Mr. Castro back later that day at around 12:00 PM to tell him that Defendant Rosero had indicated that Plaintiff should take the rest of the week off with pay.

211.    It was no coincidence that Plaintiff had alerted Defendant Rosero that he would complain the following day to Bob Wolfberg, Dan Wolfberg and Mr. Chandler about PLS's unlawful employment practices.

212.    Immediately after this conversation with Jacklyn, Mr. Castro tried to check his company emails but was unable to access his emails.

213.    A few minutes later, Plaintiff attempted to contact his stores via his company Blackberry phone to let them know that Defendant Rosero had given him the week off but found that he did not have service.

214.    Plaintiff then called Carmen Perez, the store manager of the 4th Avenue store, from his home telephone and Ms. Perez indicated to Mr. Castro that she had just received a memo that had gone out to all the stores indicating that if anyone needed to speak to Plaintiff, that they should instead contact the new district manager, Albania Almonte, who be taking over all of Mr. Castro's responsibilities.

215.    Mr. Castro then contacted the store managers at his other two stores, Byron Naranjo and Albania Garcia, who confirmed that Defendant Rosero had told them that Ms. Almonte was going to replace Plaintiff.

216.    On June 17, 2008, Plaintiff called Max Rodriguez at PLS's Corona office to advise him that a customer had a $15,000 check ready for pick up.

217.    While Mr. Castro was speaking to Mr. Rodriguez, Rosero intercepted the call and asked

Mr. Castro, "Why haven't you called me?"

218.   Mr. Castro replied that he had called Defendant Rosero's office the day before but that

Jacklyn had told him that Rosero had told Plaintiff to take the week off.

219.   Defendant Rosero claimed not to know anything about this.

220.   Mr. Castro then asked Defendant Rosero why his work email account and cell phone had

been disconnected.

221.   Defendant Rosero did not respond.

222.   Plaintiff asked Rosero, "Are you giving me a week off with pay because the owners and

VP of the company are coming into town, and you don't want me to speak with them about

everything that has been happening with me and the stores?"

223.   Plaintiff then added, "Do you want to get rid of me, is that the problem?"

224.   Defendant Rosero responded, "You are from the old school check cashiers and you do

things the old way and you are too old to work for this company any more" and told Mr. Castro

to turn in his company computer and Blackberry device.

225.   Defendant Rosero added angrily, "Angel, I know everything you complained to Luis

about me. And I know that you told Luis [Gomez] that I suspended Andre for no reason, but I

know that I was right because he didn't cash the customers check. He had no authorization to

turn down a check."

226.   Plaintiff replied, "What you did was unfair, I lost a good man. He was here for eight

years, we never had a problem with Andre and you suspended him for no reason."

227.   Then Defendant Rosero hung the phone up on Plaintiff.

228.   At that time, Plaintiff contacted his store managers to tell them that he no longer worked

for PLS.

229.    The following day, on June 18, 2008, Plaintiff called PLS's Director of HR, Emma Thomas, in Chicago to complain that Defendant Rosero had terminated his employment in retaliation for his complaints of discrimination and because he was about to lodge complaints about Defendant Rosero with the Presidents of PLS.

230.    Plaintiff described to Ms. Thomas some of the discriminatory practices at the source Plaintiff's complaints including the double standards and the fact that Andre was suspended unfairly while Hispanics were not being fired for drinking and doing drugs on the job.

231.    Ms. Thomas claimed she could not talk at that time and promised to call Plaintiff back.

232.    Ms. Thomas did not call Plaintiff back, however.

233.    Plaintiff applied for unemployment benefits but Defendants opposed Plaintiff's application on the false claim that Plaintiff had cursed at Defendant Rosero.

234.    Defendants' opposition was rejected, twice on appeal, and Plaintiff was granted unemployment benefits.

235.    Defendants were aware of, authorized and condoned the discriminatory and unlawful behavior stated herein by Defendant Rosero and Defendants' employees.

236.    The actions complained of herein were committed willingly, with reckless disregard to Plaintiff's rights and constitute a continuing policy and practice of discrimination.

237.    Defendant Rosero aided and abetted the discriminatory and retaliatory action and personally condoned and/or directed the discriminatory conduct and personally made the decision to terminate Plaintiff's employment.

238.    Plaintiff's employment was terminated in retaliation for the sum of Plaintiff's protected activity.

## FIRST CAUSE OF ACTION: SECTION 1981

239.    The allegations in the preceding paragraphs are repeated here as if fully stated.

240.    Defendants intentionally retaliated against and discriminated against Plaintiff on the basis of his race and color in violation of Section 1981.

241.    Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $1,000,000.

## SECOND CAUSE OF ACTION: RACE DISCRIMINATON AND RETALIATION (SHRL)

242.    The allegations in the preceding paragraphs are repeated here as if fully stated.

243.    Defendants intentionally racially discriminated against Plaintiff and created a racially hostile work environment in violation of the SHRL.

244.    In violation of the SHRL, Defendants intentionally retaliated against Plaintiff because of the sum of Plaintiff's protected activity, namely complaining of Defendants' race discrimination, harassment and hostile work environment.

245.    Defendants' actions were a malicious, willful and reckless violation of Plaintiff's rights.

246.    Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $1,000,000.

## THIRD CAUSE OF ACTION: RACE DISCRIMINATION AND RETALIATION (CHRL)

247.    The allegations in the preceding paragraphs are repeated here as if fully stated.

248.    In violation of the CHRL, Defendants intentionally retaliated against Plaintiff because of the sum of Plaintiff's protected activity, namely complaining of Defendants' race discrimination, harassment and hostile work environment.

249.    Defendant Rosero personally aided and abetted in the discrimination, harassment and retaliation.

250.   Defendants' actions were malicious, willful and reckless violation of Plaintiff's rights.

Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $1,000,000.

WHEREFORE, Plaintiff demands that judgment be granted as follows:

A.  The amount sought for each cause of action;

B.  Compensatory, including for pain and suffering;

C.  Liquidated damages;

D.  Punitive damages; and

E.  Attorneys fees and costs.

Dated:  New York, New York
        June 18, 2010

                                        **LAW OFFICES OF IAN WALLACE, PLLC**

By:     _____

                                        Ian Wallace (IW: 3100)
                                        Attorney for Plaintiff
                                        501 Fifth Avenue, 19th Floor
                                        New York, NY 10017
                                        (212) 661-5306